UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DAVID CRAWFORD,

    Plaintiff,

V.                                                                05-CV-1064

EUGENE McADORY, DEBI
MIDDENDORF, ROGER E. WALKER,
MELODY J. FORD, and
CHARLES HINSLEY,

    Defendants.

## Order

The parties' respective motions for summary judgment are before the Court.

### Summary Judgment Standard

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56(c). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on pleadings, but must come forth with admissible evidence. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### Background

This case is proceeding on the following claims, which all regard conditions of confinement Plaintiff experienced as a protective custody inmate in Menard Correctional Center from August 2003 to August 2004 (Case Management Order, d/e 7):

1

1. Denial of access to the courts caused Plaintiff to suffer actual injury in a criminal proceeding in New Mexico (case no. CR-95-66) and actual injury in a civil action in the Northern District of Illinois, *Crawford v. Snyder*, case no. 03-4513.

2. Placement in a smoking cell/with a smoking cellmate violated Plaintiff's Eighth Amendment rights.

3. Denial of religious services/opportunities violated Plaintiff's rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. Section 2000cc-1(a).

4. Denial of barber services violated Plaintiff's Eighth Amendment rights.

5. Different treatment of Plaintiff as a Level E, protective custody inmate in the above respects violated Plaintiff's right to equal protection under the Fourteenth Amendment.

## Undisputed Facts[1]

### *Defendants*

1. Defendant Eugene McAdory was the Chief Administrative Officer at Menard from January 1, 2003 to May 15, 2004. (McAdory Aff. ¶ 1). Defendant McAdory is currently retired.

2. Defendant Charles Hinsley was the Chief Administrative Officer at Menard from June 1, 2004 to December 31, 2004. (Hinsley Aff. ¶ 1). Defendant Hinsley is currently retired.

3. Defendant Melody Ford was an Administrative Review Board Member during the relevant time frame.

4. Defendant Debi Middendorf was a Grievance Counselor at Menard during the relevant time frame.

5. Defendant Roger Walker was the Director of the Illinois Department of Corrections during the relevant time frame and continues in that role at present.

### *Plaintiff*

6. Plaintiff was sentenced by the State of New Mexico and is incarcerated in the Illinois Department of Corrections. The IDOC website states that he is serving a life sentence for murder, and his other offenses include a prison escape, aggravated kidnaping, and possession of a stolen

---

[1] Many of the facts are adopted essentially verbatim from Defendants' proposed facts, along with Defendants' cites to the exhibits attached to their motion, to the extent not disputed by Plaintiff. (d/e 38). Plaintiff's disputes are noted where applicable.

vehicle. http://www.idoc.state.il.us.

7. Plaintiff has been classified as a "Level E" inmate by the Illinois Department of Corrections since December 8, 1995 to the present. (Exhibit E, Plaintiff's deposition, p. 7, l. 5-24; p. 8, l. 1-4). Level E means Plaintiff is considered an extremely high escape risk. As such, special security precautions must be taken. (Exhibit B, McAdory Affidavit, ¶ 13; Exhibit C, Hinsley Affidavit, ¶ 13). For example, Plaintiff is routinely transferred between maximum security prisons in the IDOC. (Amended Complaint, d/e 10, ¶ 10).

8. Menard is a maximum security prison in which Plaintiff has been incarcerated four times.

9. Plaintiff is currently incarcerated in Pontiac Correctional Center.

*Protective Custody*

10. Inmates who have known enemies or fear for their safety because of the notoriety of their crimes or other reasons can request protective custody ("P.C."). (Exhibit B, McAdory Affidavit, ¶ 16; Exhibit C, Hinsley Affidavit, ¶ 16). A voluntary P.C. inmate is an inmate who has on his own accord requested placement in P.C. (Exhibit B, McAdory Affidavit, ¶ 21; Exhibit C, Hinsley Affidavit, ¶ 21).

11. P.C. is a housing unit that is separated from the general population inmates and, generally, Level E inmates. (Exhibit B, McAdory Affidavit, ¶ 17; Exhibit C, Hinsley Affidavit, ¶ 17). Plaintiff counters that many P.C. inmate are also Level E inmates (d/e 45 p.9), but does not dispute that P.C. inmates are housed separately from general population inmates.

12. At the time of Plaintiff's incarceration in Menard in 2003-2004, he was classified as a "voluntary P.C. inmate," housed in P.C. unit North One. (Amended Complaint, d/e 10, ¶ 9). Plaintiff was in P.C. before arriving at Menard. (Exhibit E, Plaintiff's deposition, p. 8, l. 11-14).

13. Plaintiff asserts that his P.C. status was not truly voluntary, as it was the only realistic choice available to him, since he had received threats of serious bodily harm or death (d/e 45, p. 10). Plaintiff, however, does not dispute that he did request P.C. status.

14. Once an inmate requests P.C., he is taken to the P.C. unit as soon as possible where he is then interviewed for eligibility for placement. (Exhibit B, McAdory Affidavit, ¶ 21; Exhibit C, Hinsley Affidavit, ¶ 21).

15. At Menard, a Level E inmate could only be housed in certain cellhouses and had to be escorted whenever he moved within the facility. (Exhibit B, McAdory Affidavit, ¶ 14-15; Exhibit C, Hinsley Affidavit, ¶ 14-15). Plaintiff agrees, but asserts that all inmates had to be escorted, not just Level E inmates. (d/e 45, p. 9).

16. At some point in time Menard's P.C. Unit housed 400 inmates. However, this number

3

later decreased to just around 40 inmates. (Exhibit B, McAdory Affidavit, ¶ 42; Exhibit C, Hinsley Affidavit, ¶ 42).

17. As a result of the decrease in inmates requesting P.C., the number of cells available for P.C. also decreased and the former P.C. cells were then used for other types of placement. (Exhibit B, McAdory Affidavit, ¶ 42; Exhibit C, Hinsley Affidavit, ¶42).

18. One of these designations alone (P.C. or Level E) would have required additional security measures to be applied to the Plaintiff's living arrangements and movement. (Exhibit B, McAdory Affidavit, ¶ 20; Exhibit C, Hinsley Affidavit, ¶ 20). P.C. inmates remain separate from general population inmates because allowing the two groups to mix would compromise the safety of the P.C. inmates, who seek protection from general population inmates. (Exhibit B, McAdory Affidavit, ¶ 24; Exhibit C, Hinsley Affidavit, ¶ 24).

19. Whenever a P.C. inmate is taken out of his unit and into areas used by general population inmates, it increases the chances of an assault on that inmate. (Exhibit B, McAdory Affidavit, ¶ 22; Exhibit C, Hinsley Affidavit, ¶ 22).

20. Defendants assert that any time a P.C. inmate needs to be moved to another area of the prison, the movement coordinator must be called and the movement of all other inmates along the way must be stopped, with general population inmates locked behind doors or gates. (Exhibit B, McAdory Affidavit, ¶ 22; Exhibit C, Hinsley Affidavit, ¶ 22). Plaintiff disputes this, stating that P.C. inmates are exposed to General Population inmates on a daily basis through inmate workers, line movements, and in the rooms for clothing, personal property and visiting. He characterizes the actual separation of the groups as "nominal," stating that P.C. and G.P. lines often pass each other with no physical barrier.

21. Because they could not interact with general population inmates since they have asked to be kept separate from those inmates, P.C. inmates received separate meals, recreation, showers, chapel, and law library. (Exhibit B, McAdory Affidavit, ¶ 24-25; Exhibit C, Hinsley Affidavit, ¶ 24-25).

*Opportunities to Practice Religion*

22. Plaintiff avers that he is a Pentecostal Christian, a religion which he maintains requires communion and the services of a Pentecostal minister. (Plaintiff Aff. ¶ 8).

23. Defendants assert that Chapel Services for protective custody inmates were provided once during the week from 11 a.m. to Noon and on the last Sunday of the month from 11 a.m. to Noon. (Exhibit B, McAdory Affidavit, ¶ 26; Exhibit C, Hinsley Affidavit, ¶ 26; Exhibit D, Middendorf Affidavit, ¶ 9). They assert that the exception to this would have been if the Chaplain was unavailable or security issues within the institution prevented inmates from being transported to the Chapel. (Exhibit B, McAdory Affidavit, ¶ 26; Exhibit C, Hinsley Affidavit, ¶ 26; Exhibit D, Middendorf Affidavit, ¶ 9). Defendants also maintain that, based on department records, Plaintiff attended the chapel from November 2003 to August 2004. The records, however, are

4

not attached to the affidavits.

24. Plaintiff disputes the frequency of chapel visits, attaching the records he received from Defendants about movement to the chapel from PC. (Plaintiff's Ex. 15). However, those records do show (except for a few dates) that PC inmates were taken to the chapel nearly every Thursday from 11:00 a.m. until noon during the time in question. They also show that Plaintiff went to chapel over twenty times during the relevant time frame, which he does not dispute. What the records do not show is what the PC inmates did at chapel. Plaintiff admits that at Menard he was able to periodically go to Bible studies in the Chapel with other inmates and read his Bible. (Exhibit E, Plaintiff's deposition, p. 35, l. 11-24; p. 36, l. 1-10; p. 39, l. 6-19). However, Plaintiff says no services were conducted by the Chaplain and he had no opportunity to take communion.

25. Religious services were televised on the institutional T.V. channel for all inmates to access. (Exhibit B, McAdory Affidavit, ¶ 26; Exhibit C, Hinsley Affidavit, ¶ 26; Exhibit D, Middendorf Affidavit, ¶ 9). However, Plaintiff asserts the programming was irrelevant to his faith (Pentecostal), did not allow him to take Communion, and the reception was poor. (d/e 45, p. 13).

26. There were also two additional religious channels on the network at no additional charge. (Exhibit B, McAdory Affidavit, ¶ 26; Exhibit C, Hinsley Affidavit, ¶ 26; Exhibit D, Middendorf Affidavit, ¶ 9). Plaintiff counters that "neither of these two channels were Pentecostal, or of a picture and sound quality to be spiritually significant to Plaintiff." (d/e 45, p. 13).

27. The Chaplain was responsible for scheduling an inmate to come to the Chapel. (Exhibit B, McAdory Affidavit, ¶ 28; Exhibit C, Hinsley Affidavit, ¶ 28; Exhibit D, Middendorf Affidavit, ¶ 11).

28. On or about March 23, 2004, Plaintiff filed a grievance seeking to have the same opportunities as general population inmates to attend religious services, religious counseling, and communal worship services. (Middendorf Aff., Group Ex. 1).

29. Defendant Middendorf received a grievance from Plaintiff concerning denial of religious services for P.C. which she reviewed, made a recommendation, and forwarded same to the Warden's Office. (Exhibit D, Middendorf Affidavit, ¶ 5-7).

30. Defendant Middendorf recommended that she found Plaintiff's grievance to be favorable since he could attend religious services when the PC cellhouse went to said services. (Exhibit D, Middendorf Affidavit, ¶ 8). Middendorf based her recommendation on Counselor Reardon's written response that P.C. chapel services were provided weekly on Thursdays from 11 to 12 and on the last Sunday of the month from 11 to 12. The Warden (or his designee) concurred with Middendorf's recommendation, as did Defendant Ford (Administrative Review Board Member) and the Director's designee. Plaintiff contends Middendorf failed to investigate the grievance as required by the Illinois Administrative Code. (d/e 45, p. 14).

*Access to Law Library*

31. To go to the Law Library at Menard, an inmate needed to submit a written request addressed to the Law Library by placing said request in the institutional mail. (Exhibit B, McAdory Affidavit, ¶ 29; Exhibit C, Hinsley Affidavit, ¶ 29; Exhibit D, Middendorf Affidavit, ¶ 23; Exhibit F, Shorn Affidavit, ¶ 5).

32. The mail is then picked up and distributed to the Law Library, whose staff would place an inmate on the Law Library schedule. (Exhibit B, McAdory Affidavit, ¶ 29; Exhibit C, Hinsley Affidavit, ¶ 29; Exhibit D, Middendorf Affidavit, ¶ 23; Exhibit F, Shorn Affidavit, ¶ 5-6).

33. Scheduling would depend on available space on the schedule and within the Law Library, court deadlines, and staffing considerations. (Exhibit B, McAdory Affidavit, ¶ 30; Exhibit C, Hinsley Affidavit, ¶ 30; Exhibit D, Middendorf Affidavit, ¶ 24; Exhibit F, Shorn Affidavit, ¶ 6).

34. Once an inmate is placed on the schedule, a call pass is issued for the inmate to come to the Law Library. (Exhibit B, McAdory Affidavit, ¶ 30; Exhibit C, Hinsley Affidavit, ¶ 30; Exhibit D, Middendorf Affidavit, ¶ 24; Exhibit F, Shorn Affidavit, ¶ 6).

35. The call passes are distributed by the cellhouse correctional staff. (Exhibit B, McAdory Affidavit, ¶ 30; Exhibit C, Hinsley Affidavit, ¶ 30; Exhibit D, Middendorf Affidavit, ¶ 24; Exhibit F, Shorn Affidavit, ¶ 6). Plaintiff, however, says call passes for P.C. inmates often were not distributed. (d/e 45, p. 15).

36. An inmate receiving a call pass to the Law Library may decide to refuse the pass and not go to the Law Library. (Exhibit B, McAdory Affidavit, ¶ 30; Exhibit C, Hinsley Affidavit, ¶ 30; Exhibit D, Middendorf Affidavit, ¶ 24; Exhibit F, Shorn Affidavit, ¶ 6).

37. If necessary, Law Library operations may have been suspended or limited during institutional lockdowns. (Exhibit B, McAdory Affidavit, ¶ 32; Exhibit C, Hinsley Affidavit, ¶ 32; Exhibit D, Middendorf Affidavit, ¶ 26; Exhibit F, Shorn Affidavit, ¶ 10).

38. During an institutional lockdown, an inmate stays in his cell and is only moved if necessary. (Exhibit B, McAdory Affidavit, ¶ 32; Exhibit C, Hinsley Affidavit, ¶ 32; Exhibit D, Middendorf Affidavit, ¶ 26; Exhibit F, Shorn Affidavit, ¶ 10).

39. Defendants contend that library staff would tour the cellhouses during institutional lockdowns to determine what law library services were needed. (Exhibit B, McAdory Affidavit, ¶ 32; Exhibit C, Hinsley Affidavit, ¶ 32; Exhibit D, Middendorf Affidavit, ¶ 26; Exhibit F, Shorn Affidavit, ¶ 10). Plaintiff disputes this. (d/e 45, p. 15).

40. Inmates who had court deadlines, i.e. verifiable dates by which some action must be completed, would receive priority for law library services. (Exhibit B, McAdory Affidavit, ¶ 33; Exhibit C, Hinsley Affidavit, ¶ 33; Exhibit D, Middendorf Affidavit, ¶ 27; Exhibit F, Shorn Affidavit, ¶ 11).

41. It was the inmate's responsibility to inform the Law Library of the existence of these

deadlines. (Exhibit B, McAdory Affidavit, ¶ 33; Exhibit C, Hinsley Affidavit, ¶ 33; Exhibit D, Middendorf Affidavit, ¶ 27; Exhibit F, Shorn Affidavit, ¶ 11).

42. Defendants assert that, within the Law Library are study carrels or cells which are used as a security precaution for inmates who, due to security reasons such as escape risk, cannot be allowed to freely roam the Law Library. (Exhibit B, McAdory Affidavit, ¶ 34; Exhibit C, Hinsley Affidavit, ¶ 34; Exhibit D, Middendorf Affidavit, ¶ 28; Exhibit F, Shorn Affidavit, ¶12). Plaintiff disputes this, advancing that the "carrels" are just bare cages meant for inmates in disciplinary segregation, not for P.C. inmates. (d/e 45, p. 16).

43. Defendants assert that, when Level E inmates went to the law library they had 10 to 15 minutes to gather the research materials, forms, books, paper, etc. that they would need for the evening. (Exhibit B, McAdory Affidavit, ¶ 35; Exhibit C, Hinsley Affidavit, ¶ 35; Exhibit D, Middendorf Affidavit, ¶ 29; Exhibit F, Shorn Affidavit, ¶ 13). Plaintiff disputes this, stating that "more often than not" P.C. Level-E inmates were immediately confined to the cages. (d/e 45 p. 17).

44. Defendants assert that the officer escorting the inmates to the Law Library would then lock the inmates in the study cells and Law Library staff would check on them regularly to see if they needed anything. (Exhibit B, McAdory Affidavit, ¶ 36; Exhibit C, Hinsley Affidavit, ¶ 36; Exhibit D, Middendorf Affidavit, ¶ 30; Exhibit F, Shorn Affidavit, ¶ 14). Plaintiff disputes this.

45. Law Library staff were responsible for providing all inmates copies of case law, photocopies, notary services, etc. (Exhibit B, McAdory Affidavit, ¶ 39; Exhibit C, Hinsley Affidavit, ¶ 39; Exhibit D, Middendorf Affidavit, ¶ 33; Exhibit F, Shorn Affidavit, ¶ 18).

46. Plaintiff believes he went to the Law Library once every two weeks. (Exhibit E, Plaintiff's deposition, p. 14, l. 4-6). Plaintiff admits that "at times due to varified [sic] deadlines he was offered more attendance to the library cages." (d/e 45, p. 18).

47. Plaintiff went to the Law Library in 2003 on the following dates: September 17, 23, 24; October 21, 29; November 12, 18; December 3, 17, and 30. (Exhibit F, Shorn Affidavit, ¶ 20). 65. In 2004, Plaintiff went to the Law Library on the following dates: February 11, 24; March 9, 24; April 3, 6, 20; May 4, 18; June 9; July 7, 21; and August 10. (Exhibit F, Shorn Affidavit, ¶ 21).

48. Plaintiff went to the Law Library to work on his motion for summary judgment in a pending civil rights suit in the Northern District of Illinois and to work on challenging his criminal conviction. (Exhibit E, Plaintiff's deposition, p. 17, l. 10-22).

49. The civil suit was a 42 U.S.C. §1983 suit in the Northern District of Illinois, in which Plaintiff claimed his constitutional rights were violated because he, a protective custody inmate, was not allowed to have a prison job and the same recreational and religious opportunities, law library access, and access to prison programs as a general population inmates. (*See Crawford v.*

*Snyder*, Case No. 03-4513 (N.D. Ill. filed June 30, 2003), CM/ECF Court Document #1).

50. On January 25, 2005, the Northern District of Illinois Court in *Crawford v. Snyder* granted summary judgment in favor of the correctional defendants and judgment was entered. (Crawford v. Snyder, Case No. 03-4513 (N.D. Ill. filed June 30, 2003), CM/ECF Court Documents #52-53).

51. On February 25, 2005, Plaintiff filed a notice of appeal in his civil case. (*Crawford v. Snyder*, Case No. 03-4513 (N.D. Ill. filed June 30, 2003), CM/ECF Court Document #58). On July 26, 2005, the appeal was dismissed for failure to pay the filing fee. (See Crawford v. Snyder, No. 05-1494 (7 Cir.)). At the time of dismissal for failure to pay the fee, Plaintiff was in Pontiac. (Exhibit E, Plaintiff's deposition, p. 21, l. 8-14).

52. As for his criminal case, Plaintiff was able to conduct what he calls "extremely limited research." (Exhibit E, Plaintiff's deposition, p. 18, l. 18-20).

53. Plaintiff filed an appeal of his criminal conviction at Pontiac Correctional Center which was denied in June 2005. (Exhibit E, Plaintiff's deposition, p. 19, l. 1-23).

54. On or about March 23, 2004, Plaintiff filed a grievance about his lack of library access. (Middendorf Aff., Group Ex. 1). Defendant Middendorf received a grievance from the Plaintiff concerning access to the law library and legal materials which she reviewed, made a recommendation, and forwarded same to the Warden's Office. (Exhibit D, Middendorf Affidavit, ¶ 19-21). Defendant Middendorf recommended that she found Plaintiff's grievance to be "favorable" on the grounds that he could go to the law library and when there he was given 15 minutes to obtain the books he needed. (Exhibit D, Middendorf Affidavit, ¶ 22). The Warden (or his designee) concurred with Middendorf's analysis, as did Defendant Ford (Administrative Review Board Member) and the Director's designee.

*Access to Barber Services*

55. Plaintiff avers that he has an unnamed scalp condition that causes itching, irritation, rash and sores that tend to become infected. (Plaintiff's Aff. ¶ 17). This condition is improved if the plaintiff keeps his hair cut short and uses the medicated shampoo provided by the IDOC.

56. Defendants assert that, in order to receive a haircut and/or shave, an inmate had to send a note requesting same to the Barber Shop. The Barber would then schedule the inmate for a haircut and/or shave as soon as possible. (Exhibit B, McAdory Affidavit, ¶ 41; Exhibit C, Hinsley Affidavit, ¶ 41; Exhibit D, Middendorf Affidavit, ¶ 18). The Barber Shop was responsible for providing these services to all the inmates at Menard. (Exhibit B, McAdory Affidavit, ¶ 41; Exhibit C, Hinsley Affidavit, ¶ 41; Exhibit D, Middendorf Affidavit, ¶ 18). Plaintiff counters that P.C. inmates were not allowed access to the barber shop, and that his repeated requests for a haircut were not answered. (d/e 45, p. 20; Plaintiff's Aff. ¶ 18).

57. Plaintiff avers that he resorted to fingernail clippers and a comb to cut his hair, "often

resulting in nicks and cuts, which tended to become sore and infected and cause me considerable pain." (Plaintiff's Aff. ¶ 19). However, Plaintiff also avers that "By not maintaining my hairstyle as shown on my Identification Card, I was also subject to haircuts 'forcibly' done by staff and disciplinary actions, even though access to the Institutional barber was supposed to be by request." (Plaintiff's Aff. ¶ 25). It is not clear if Plaintiff means that his hair was forcibly cut or that he was at *risk* of having his hair forcibly cut.

58. An inference arises from Plaintiff's evidence that P.C. inmates were not allowed to go to the institution barber school or shop. (Plaintiff's Exs. B-K). However, Plaintiff's evidence shows that volunteer inmate barbers did provide haircuts to PC inmates, though the location of those haircuts is not stated. (Plaintiff's Ex. B, Goodman Aff. ¶ 3 "P.C. inmates were forced to rely upon the whims of the cell house Lieutenant Waller to locate and approve a VOLUNTEER barber, resulting in lengthy periods of sometimes months between when haircuts were available.")(Plaintiff's Ex. A, Att. 21, PC haircut log); (Plaintiff's Aff. ¶ 24).

59. Plaintiff admits that a volunteer barber was assigned to P.C. in or around April 2004. However, he says the volunteer refused to cut Plaintiff's hair because the volunteer's HIV positive status and Plaintiff's scalp condition. (d/e 45, p. 50; Haircut Log attached as #21). According to the PC haircut log, haircuts were given in April, May, and August of 2004, though Plaintiff's name is not in the log. (Plaintiff's Ex. 21).

60. On or about March 23, 2004, Plaintiff filed a grievance asking to have the same opportunity to go to barber school as the general population inmates. Counselor Reardon's response states, "This issue is currently being looked into by the Administration. It should be resolved soon." (Middendorf Aff., Group Ex. 1).

61. Defendant Middendorf received a grievance from the Plaintiff concerning the lack of a barber in P.C. which she reviewed, made a recommendation, and forwarded same to the Warden's Office. (Exhibit D, Middendorf Affidavit, ¶ 13-15). Defendant Middendorf recommended that she found the Plaintiff's grievance to be "favorable" since he would be able to access barber services as soon as a North I barber was assigned. (Exhibit D, Middendorf Affidavit, ¶ 16). Her response states:

> "Response from counselor Reardon states the issue is currently being looked into by the Administration. This grievance officer spoke with the Major and he stated that this issue is being addressed by Administration at this time, due to the fact they have no barber in North I."

62. The Warden's designee concurred with Middendorf's analysis, as did Defendant Ford (Administrative Review Board Member) and the Director's designee.

*Non-smoking Cell/Cellmate*

63. There are no designated non-smoking cells in Protective Custody at Menard. (Exhibit B, McAdory Affidavit, ¶ 46; Exhibit C, Hinsley Affidavit, ¶ 46; Exhibit D, Middendorf Affidavit,

9

¶ 39). Inmates in general population can request a non-smoking cell, and Menard does have designated non-smoking sections in housing units in the general population. (Plaintiff's Ex. 3). According to Menard's policy, smoking is permitted only in designated areas, which include outdoors and in inmate living areas (except for non-smoking cell assignments). Smoking is prohibited in all other areas. *Id.*

64. Plaintiff is a non-smoker, and avers that he requested "a Non-Smoking cell assignment/environment free from areas where smoke accumulates and hovers." (Plaintiff's Aff. ¶ 40).

65. Defendants assert that correctional staff and the Placement Office may, at the inmate's request, try to have non-smoking inmates celled together and smoking inmates celled together. (Exhibit B, McAdory Affidavit, ¶ 47; Exhibit C, Hinsley Affidavit, ¶ 47; Exhibit D, Middendorf Affidavit, ¶ 40). Plaintiff counters that this is not done in practice. (d/e 45, p. 22).

66. Non-smoking cell requests are handled through the staff working in the Placement Office. (Exhibit B, McAdory Affidavit, ¶ 43; Exhibit C, Hinsley Affidavit, ¶ 43; Exhibit D, Middendorf Affidavit, ¶ 43). Plaintiff disputes this, on the grounds that the assertion is contradicted by Defendants' statement that other correctional officers may, in their discretion, work with the Placement Office to cell non-smokers together. (d/e 45, p. 22).

67. Defendants McAdory, Hinsley, and Middendorf did not work in the Placement Office. (Exhibit B, McAdory Affidavit, ¶ 44; Exhibit C, Hinsley Affidavit, ¶ 44; Exhibit D, Middendorf Affidavit, ¶ 44).

68. Defendants assert that housing determinations for protective custody would be made by the Placement Office. (Exhibit E, Plaintiff's deposition, p. 31, l. 21-23). Plaintiff disputes this, but he offers no evidence to support a contrary inference. (d/e 45, p.23).

69. Defendants assert that, pursuant to Departmental records, Plaintiff did not make a request for a non-smoking cell at Menard. (Exhibit B, McAdory Affidavit, ¶ 45; Exhibit C, Hinsley Affidavit, ¶ 45; Exhibit D, Middendorf Affidavit, ¶ 41). Plaintiff counters that he made several written requests in January, April and May 2004 that were not processed. (d/e 45, p. 23).

70. On or about May 24, 2004, Plaintiff filed a grievance asking for a non-smoking cellmate. Counselor Reardon's response states, "The P.C. unit does not provide non-smoking cells."

71. Defendant Middendorf received Plaintiff's grievance concerning a non-smoking cell request which she reviewed, made a recommendation, and forwarded same to the Warden's Office. (Exhibit D, Middendorf Affidavit, ¶ 35-37). Defendant Middendorf recommended that she found the Plaintiff's grievance to be mixed in that Plaintiff's request for assignment to a non-smoking cell in P.C. would be denied and favorable as Plaintiff could be registered as a non-smoker through his counselor. (Exhibit D, Middendorf Affidavit, ¶ 38). Her basis for decision states, "Response from Counselor Reardon states the PC unit does not provide non-smoking cell. This grievance officer

spoke with placement and staff informed this officer the PC is a temporary housing unit. Offender can request a non-smoking cell in general population. . . ." (Middendorf Aff., Group Ex. 1).

*Miscellaneous*

72. Administrative Review Board member Terri Anderson, a designee for Defendant Walker, signed Walker's name to the Administrative Review Board responses. (Exhibit A, Ford Affidavit). Plaintiff does not dispute this, but he contends that Defendants failed to disclose the name of Walker's designee in their Answer or through discovery. However, Defendants did disclose in their Answers that a designee had signed.

73. Defendant Ford (Administrative Review Board Member) was not consulted and did not participate in any decisions made at Menard concerning Plaintiff's access to the law library, a barber, religious services, and a non-smoking cell; his security or escape assessments; his housing assignments; his protective custody issues; or his movement within and around Menard Correctional Center. (Exhibit A, Ford Affidavit, ¶ 13-14, 16). Nor, did Defendant Ford implement any Departmental or Institutional rules concerning these issues. (Exhibit A, Ford Affidavit, ¶ 15).

74. Defendant Ford did not personally observe Plaintiff's access to the law library, the barber, the religious services, a non-smoking cell, his housing assignment or his movement within and around Menard Correctional Center. (Exhibit A, Ford Affidavit, ¶ 17-18).

**Analysis**

This case is about the conditions of confinement Plaintiff experienced as a Level E, protective custody inmate in Menard Correctional Center (Menard) from August 2003 to August 2004. Because Plaintiff is likely to be transferred to Menard again as a protective custody inmate, this case is also about the conditions of confinement the plaintiff is likely to experience in the future as a Level E, protective custody inmate at Menard Correctional Center. Contrary to Plaintiff's assertions, this case does not include conditions at Stateville or any other prison, nor does it include the propriety of Plaintiff's classification as a Level E inmate.

**I. Res Judicata and Collateral Estoppel**

The court cannot conclude that the plaintiff's litigation in *Crawford v. Snyder*, 03-4513 (N.D. Ill) bars this lawsuit under *res judicata* or collateral estoppel. Overlap is present, in that some of the defendants and applicable law are the same in both cases. However, the Northern District case involves conditions in Stateville Correctional Center. This case involves conditions in Menard Correctional Center. The facts, therefore, are not identical, nor can the court conclude that Plaintiff could have raised his claims here in the Northern District case.

**II. Access to the Courts**: **Summary Judgment Granted to Defendants**

Plaintiff challenges being placed in a "cage" when he attended the library. He asserts that he was unable to access any legal assistance or materials as a result of being in the cage. This

argument misses the mark. To succeed on his access claim, Plaintiff must show he suffered "actual injury" from the inability to pursue a nonfrivolous claim. *Lewis v. Casey*, 116 S.Ct. 2174, 2179-80 (1996); *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000); *Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998)(actual injury occurs when plaintiff blocked from litigating a nonfrivolous case). The lack of access to legal help or materials, by itself, is not enough. "[A] right to access-to-courts claim exists only if a prisoner is unreasonable prevented from presenting legitimate grievances to a court; various resources, documents, and supplies merely provide the instruments for reasonable access, and are not protected in and of themselves." *Ortloff v. United States*, 335 F.3d 652, 656 (7th Cir. 2003).

Plaintiff does not present any evidence that he was unable, in a concrete way, to litigate a nonfrivolous case. That is, there is no evidence of "actual injury." He does not explain how his access to legal materials at Menard actually affected either case. Plaintiff does not dispute that he did file an appeal of his criminal conviction at Pontiac, nor is there any information regarding what was going on with the criminal case during his stay at Menard. As to his civil case, Plaintiff says that his appeal in the civil case was dismissed because of his lack of access at Menard, but that is not true. The appeal was dismissed for failure to pay the filing fee. *Crawford v. Snyder*, 05-1494 (7th Cir., 7/26/05 Order). In short, he does not explain what he was denied at Menard that might have saved either case. Any inference of actual injury would be based on speculation and conjecture. Accordingly, summary judgment is mandated for Defendants on this claim.

Nor does an equal protection violation arise from the different library access Plaintiff received compared to an inmate in general population. "In the prison context, the Equal Protection Clause of the Fourteenth Amendment requires inmates to be treated equally, unless unequal treatment bears a rational relationship to a legitimate penal interest." *May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000). Plaintiff is an extremely high escape risk, as well as a protective custody inmate. He is not similarly situated to general population inmates in regards to policies on outside-cell movement because he is an extremely high escape risk due to his prior prison escape. That alone justifies Plaintiff's inability to walk about in the library–the restriction is rationally related to a legitimate penological interest in preventing Plaintiff from attempting another prison escape. Plaintiff's P.C. status provides additional reason for restricting his ability to walk about the library. *See Smith v. Shawnee Library System*, 60 F.3d 317, 324 (7th Cir. 1995)(confining P.C. inmates to locked cells in library did not violate right of access).

**III.    Non-Smoking Cellmate/Non-Smoking Cell: Summary Judgment Granted to Defendants *except* as to Current Warden in Official Capacity on Claim for Injunctive Relief.**

A prisoner's unwilling exposure to second-hand smoke may give rise to an Eighth Amendment claim of cruel and unusual punishment, either based on a present injury and/or a future injury. Like other Eighth Amendment claims, however, the standard is a high hurdle, requiring both an objectively serious risk, and subjective, deliberate indifference to that risk by Defendants. *Henderson v. Sheahan*, 196 F.3d 839, 844-848 (7th Cir. 2000).

As to present injury claims, the prisoner must show that "the second-hand smoke caused him to suffer 'serious' existing health problems and that the Defendants were deliberately indifferent to his situation." *Id.* at 845. A serious health problem is a medical condition diagnosed by a physician as requiring a "smoke-free environment," or a condition needing treatment by a physician that was caused by the exposure to the smoke. *Id.* at 846. The deprivation must be extreme to be objectively serious. *Id.* ("breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy–are, objectively speaking, relatively minor); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996)(prisoner with mild and controlled asthma did not have serious medical need to support award for damages based on present injury from exposure to second-hand smoke; wheezing and discomfort not enough)(Judge Wood, dissenting); *Goffman v. Gross*, 59 F.3d 668 (7th Cir. 1995)(upholding factual finding that inmate failed to prove serious medical condition exacerbated by second-hand smoke solely on fact that inmate had been successfully treated for lung cancer by removal of lung) .

As to future injury claims, the Supreme Court held in *Helling v. Mckinney*, 509 U.S. 25 (1993) that a prisoner may state an Eighth Amendment claim for future injury with allegations of exposure, with deliberate indifference, to "levels of ETS [environmental tobacco smoke] that pose an unreasonable risk of damage to his future health." This is also a high hurdle, requiring Plaintiff to show he personally was exposed to "'unreasonably high levels'" of second-hand smoke, which posed an unreasonable risk to his future health personally, and that the defendants were deliberately indifferent to that risk. *Lehn v. Holmes*, 364 F.3d 862, 872 (7th Cir. 2004), *quoting Helling*; *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 2000). Plaintiff must prove "more than just a 'scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused . . . . . .' it also requires that [Plaintiff] prove 'that the risk of which he complains is not one that today's society chooses to tolerate.'" *Henderson*, 196 F.3d at 848, *quoting Helling*, 113 S.Ct. 2475. To recover damages, Plaintiff must have "competent and reliable expert medical testimony that there was a reasonable medical certainty that he himself faces some defined level of increased risk of developing a serious medical condition and that this increased risk was proximately caused by his exposure to second-hand smoke . . ." *Henderson*, 196 F.3d at 852 (applying Illinois law).

As to present injury, Plaintiff avers that IDOC's refusal to provide a non-smoking housing assignment caused him "extreme headaches, sinus troubles, allergic reactions, burning and itching eyes, nausia [sic], as well as a deadly threat to my future health." These symptoms are not serious enough to amount to a present injury claim. *See Oliver,* 77 F.3d at 158-61 ("chest pains, difficulty in breathing, dizziness, nausea and other signs of discomfort" of asthmatic inmate did not survive summary judgment on present injury claims).
; *Henderson*, 196 F.3d at 839 (upholding dismissal for failure to state a claim on allegations of "breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy"). There is no evidence or information on Plaintiff's "allergic reaction,"–no inference arises that the plaintiff had any serious allergic reaction or had an allergy or some other serious condition exacerbated or caused by the smoke. There is no medical evidence that Plaintiff's current health required a smoke-free environment.

As to future injury, Plaintiff asserts that the IDOC knows that "exposure to Environmental Tobacco Smoke (ETS) represents a Serious and ultimately lethal threat to my . . . Future Health and Safety." (Plaintiff's Aff. ¶ 51). He attaches documents from the U.S. Department of Health and Human Services, World Health Organization, and Surgeon General's Report. The document from the World Health Organization reports that "There is clear scientific evidence of an increased risk of lung cancer in non-smokers exposed to SHS [secondhand smoke]. This increased risk is estimated at 20% in women and 30% in men. . . . It has also been shown that non-smokers exposed to SHS have a 25 to 35% increased risk of suffering acute coronary diseases . . . ." (Plaintiff's Ex. 43).

This general statistical evidence is not enough to support an award of compensatory damages for future injury to Plaintiff's health. *See Henderson*, 196 F.3d at 852 (expert testimony that exposure leads to 20% increase in risk of developing atherosclerosis as a general proposition not enough–expert admitted he could not testify to reasonable degree of certainty whether a particular person would develop smoking-related illness, and testimony suggested it would be "virtually impossible" to attribute a future illness to the smoke exposure versus other causes)(applying Illinois law). Plaintiff has no competent evidence that he personally faces a defined level of increased risk of developing a serious medical condition and that this increased risk was proximately caused by his exposure to second-hand smoke . . ." *Henderson*, 196 F.3d at 852 (applying Illinois law). There is not even any evidence on the amount of smoke to which Plaintiff was exposed, much less a defined and quantified conclusion of how that exposure will affect Plaintiff's health in the future. The possibility of future injury to Plaintiff is simply too speculative for damages.

While the record does not support an award of damages for future injury to Plaintiff's health, injunctive relief may be available. *See Henderson*, 196 F.3d at 839 n. 3 (discussing *Helling's* focus on injunctive relief). The possibility of injunctive relief is arguably not moot on the present record, as the parties agree that Plaintiff is transferred between maximum security prisons regularly. An inference arises the Plaintiff's protective custody and Level E status is not likely to change. There is also an inference that there are no designated non-smoking cells in P.C. at Menard, and that no attempt is made to house non-smoking P.C. inmates together. For example, Plaintiff submits the affidavit of James Rodgers, another Level E, P.C. inmate who avers that his requests for a non-smoking cell assignment while at Menard were denied, though he was at Menard during the same time as Plaintiff. (Plaintiff's Ex. C). Defendants offer no explanation for the different treatment of protective custody and general population inmates in relation to the non-smoking policies. Plaintiff's evidence also allows an inference that the Warden is responsible for setting policies on smoking and for designating areas as non-smoking, and that inmate's request for non-smoking assignments are accommodated if possible. (*See* Plaintiff's Ex. 7; Ex. 30, pp. 29, 31, 31, 32).[2] An inference also arises that the housing unit

---

[2] P. 0024, para. 6: "The designation of smoking or non-smoking areas may be changed at any time by the Warden based on, among other matters, offender or staff requests, or fire safety in smoking areas, or administrative reasons." Menard's policy is "to ensure that non-smokers

supervisor and Placement office makes those decisions, but the Warden's responsibility in an official capacity cannot be ruled out present record. There are other arguments against the possibility of injunctive relief as well, but those determinations need a more developed factual record and legal argument. *See Helling*, 509 U.S. at 35-37 (discussing elements of successful claim for injunctive and other relief).

At this point, Plaintiff's request for injunctive relief remains in the case, both under the Eighth Amendment and the Fourteenth Amendment. However, the court believes the injunctive relief available, even if Plaintiff can meet the standards for injunctive relief, is limited. *See* 18 U.S.C. § 3626. To the extent Plaintiff seeks injunctive relief in this case, the court interprets that request to having Plaintiff's future requests at Menard for a non-smoking cell/inmate handled the same as requests from a general population inmate. This does not mean that Plaintiff would be guaranteed a designated non-smoking cell or a non-smoking inmate when he returns to Menard, but only that his request would be processed and accommodated like a request from an inmate in the general population. That is, that the non-smoking policies at Menard will be applied to Plaintiff on the same basis as an inmate in general population. Defendants' choices for Plaintiff's cell placement are already substantially restricted because of Plaintiff's Level E and P.C. status. It may be that, at the time of Plaintiff's request on his return to Menard, there will simply be no other non-smoking cellmates available for Plaintiff, making accommodation of his request impossible. That would not be deliberate indifference. *DeMallory v. Cullen*, 855 F.2d 442, 455 (7th Cir. 1988)("...the Eighth Amendment does not require prison officials to do the impossible.").

The claim for injunctive relief remains in only against the present Warden of Menard in his official capacity, who will be substituted in the case under Fed. R. Civ. P. 25(d)(1).

## IV. Religious Practice: Summary Judgment Granted to Defendants

Plaintiff's religious practice claim remains factually vague. Plaintiff asserts that he was unable to regularly attend "religious services, communal worship services, religious counseling or religious sacrament" for his Pentecostal faith, to the same extent as inmates in general population. (Amended Complaint, d/e 28, ¶ 28;Plaintiff's Aff. ¶ 8). However, there is no evidence on what Pentecostal inmates in the general population received. He does not he give any information about his interactions with the Chaplain at Menard, who was the person responsible for providing religious services. There is no information on Plaintiff's communications with the Chaplain, if any, or information on whether communion was available to Plaintiff in his cell. Plaintiff says the televised religious programming was irrelevant to his Pentecostal faith (a branch of Christianity), but he does not say what programs were televised.

---

shall have preference for non-smoking housing assignments where possible." (Plaintiff's Ex. 30). The policy further directs the Placement Office to "ensure the offender is assigned to a non-smoking housing area . . ." and "keep the Warden informed of problems encountered or if an accommodation cannot be granted within a reasonable time frame."

Further, Plaintiff admitted in his pending civil case in the Northern District of Illinois, that he *was* receiving religious services at Menard. In the Northern District case, Plaintiff moved to supplement his complaint by adding a claim against Defendant McAdory for denial of religious services. In a later reply dated November 12, 2003, Plaintiff stated: "Defendants have made Religious Services available to the Plaintiff in Menard Correctional Center so Plaintiff's claims under 42 U.S.C. § 2000 are withdrawn without prejudice." *Crawford v. Snyder*, 03-C-4513 (Doc. 26). Plaintiff explains that this pleading referred to his prior incarceration in Menard, but the pleading plainly states otherwise. On the other hand, Defendants have not provided specifics about Plaintiff's opportunities to practice his religion either. The Chaplain's affidavit is notably absent from Defendants' motion, and Plaintiff has not named the Chaplain as a defendant.

At most, an inference arises that there were no communal worship services available to Plaintiff that were led by a Chaplain (whether non-denominational or not), and no opportunity to receive communion. Instead, Plaintiff's visits to the chapel were only bible studies led by inmates. These inferences are drawn in Plaintiff's favor, as they must be. Compelling reasons for this situation might exist, such as security concerns, economic realities, and logistical practicalities, given Plaintiff's status as a high escape risk and protective custody inmate. Defendants do allude to this problem in their affidavits in a general way, but not with sufficient specificity to make a record justifying summary judgment in their favor on that grounds under RLUIPA (compelling interest, least restrictive means) or the First Amendment (reasonable relation to legitimate penological interest). *See Williams v. Lane*, 851 F.2d 867, 886 (7th Cir. 1988)(rejecting defendants' "reflexive, rote assertions" for restrictions on P.C. inmates).

However, assuming Plaintiff can establish a RLUIPA or First Amendment violation, the Court agrees with Defendants that Plaintiff has not presented evidence of personal responsibility of the named defendants. Defendant Middendorf, the grievance counselor, relied on counselor Reardon's written response to Plaintiff's grievance that religious services *were* provided to PC inmates on Thursdays from 11-12, and the last Sunday of the month. (Middendorf Aff. ¶ 5-8). Plaintiff argues that Middendorf had a duty to investigate the truth of Reardon's assertion, but that duty (if it does exist) does not arise from federal law. There is no evidence to suggest Middendorf should have suspected Reardon's account was false. In fact, even if Middendorf had investigated, the records do show PC inmates were taken to chapel nearly every Thursday, though the records do not show what the inmates did once there. Middendorf averred that the Chaplain made the decisions about the presentation of religious services and an inmates' access to those services. (Middendorf Aff. ¶ 11). There is no evidence to dispute that assertion. Middendorf did not violate any federal law by relying on Reardon's reassurance that Plaintiff *did* have weekly access to services. Since Middendorf violated no federal right of Plaintiff's, the Defendants (or their designees) who concurred with Middendorf's recommendation could not have violated Plaintiff's rights. In short, there is no evidence that Defendants knew that Plaintiff did not have an opportunity to attend religious services–according to Reardon, Plaintiff *did* have a weekly opportunity to attend religious services as well as on Sundays. The person responsible for those opportunities was the Chaplain, who is not a defendant in this case. Additionally, the record does not allow an inference that Plaintiff will likely experience similar problems when he returns to Menard. Therefore, his claim for injunctive relief is dismissed as well.

As for his equal protection claim that protective custody inmates should have identical worship opportunities as the general population, Plaintiff is not similarly situated to general population inmates. As a Level E inmate, Plaintiff presents significantly higher security concerns for the safety of others inside and outside the prison. His P.C. status adds security concerns related to his own safety from attacks from other inmates. Allowing Plaintiff to attend chapel services weekly with other P.C. inmates do bears a rational relationship to those penal interests. The court realizes Plaintiff says he did not attend services weekly, but as discussed above, even if that is true, Defendants were not personally responsible for that failure.

**V. Barber Services: Summary Judgment Granted to Defendants.**

It is not clear whether Plaintiff is claiming he had no access to a barber at Menard during the entire year he stayed there, or that he simply could not access the barber shop. An inference arises from Plaintiff's evidence that PC inmates were not allowed to go to the prison barber *shop*. (Plaintiff's Exs. B-K). However, the evidence also shows that a volunteer inmate barbers did provide haircuts to PC inmates when available. (Plaintiff's Ex. B, Goodman Aff. ¶ 3 "P.C. inmates were forced to rely upon the whims of the cell house Lieutenant Walker to locate and approve a VOLUNTEER barber, resulting in lengthy periods of sometimes months between when haircuts were available.")(Plaintiff's Ex. A, Att. 21, PC haircut log); (Plaintiff's Aff. ¶ 24).

Plaintiff does admit that a volunteer inmate barber was assigned to his unit in April 2004. Plaintiff avers, however, that the volunteer barber refused to cut Plaintiff's hair because the volunteer barber is HIV positive, there were no proper supplies for sterilizing the equipment, and the plaintiff had a scalp condition. (d/e 45, p. 50). Plaintiff's evidence also shows that a volunteer barber did provide haircuts in April, May and August of 2004, though not for Plaintiff. (Plaintiff's Ex. A, Att. 21, PC haircut log)

Construing all ambiguities, inferences and silences in Plaintiff's favor as the court must, a reasonable inference arises on the current record that he had no opportunity for a barber to cut his hair for the entire year he stayed at Menard. The court assumes for purposes of this order only that this is a sufficiently serious deprivation to meet the Eighth Amendment's objective standard test.

The problem for Plaintiff is proving personal responsibility or deliberate indifference of Defendants. Plaintiff filed his grievance in March 2004, informing officials of his inability to attend the barber shop for a haircut and asking to "have the same opportunity to attend the barber school . . . as General Population has." (Attachment to McAdory Aff.). Defendant Middendorf relied on the representation of Counselor Reardon and a Major that the "Administration" was addressing the lack of barber for the P.C. inmates. As discussed above, Middendorf did not violate Plaintiff's federal rights by relying on representations of prison officials that the issue was being addressed, nor is there any evidence she had any power over the assignment of a barber to the P.C. inmates. Similarly, Defendant Ford (Administrative Review Member) and Walker (or his designee) violated no federal right of Plaintiff by relying on those representations that the problem was being addressed by the "Administration."

It is not clear who in the "Administration" would have been responsible for seeing to it that a barber was provided to the P.C. inmates. The Wardens say the Barber shop was responsible for fulfilling requests for haircuts. Yet, at least on the current record, an inference cannot be ruled out that the lack of barber in P.C. was a staffing problem, perhaps within the control of the Warden. However, even if the Warden knew of and had the authority to rectify the situation, Plaintiff does not dispute that a volunteer barber was provided shortly after Plaintiff filed his grievance in March 2004. P.C. haircuts were given in April, May and August (though none in June and July, according to the log). Thus, except for two months, at least to Defendants' knowledge the situation was rectified shortly after Plaintiff notified Defendants of the problem in his grievance. There is nothing in the record that allows an inference that Plaintiff informed anyone of the barber's alleged HIV status or refusal to cut Plaintiff's hair.[3] The only inference allowed on the record is that a volunteer barber was assigned to Plaintiff's unit after Plaintiff filed his grievance, and that volunteer inmate barbers provide haircuts to P.C. inmates when available. Summary judgment will therefore be granted to Defendants on this claim.

Plaintiff's equal protection claim that protective custody inmates should have the same access to barber services as general population inmates fails. As discussed above, Plaintiff's movements outside his cell are restricted because of the security concerns posed by his Level E and P.C. status. He is not similarly situated to general population inmates in regards to security concerns posed by outside-the-cell movements. Prohibiting Plaintiff (and other P.C. inmates) from going to the barber shop and instead providing a volunteer barber is rationally related to addressing those concerns.

IT IS THEREFORE ORDERED:

    1) Defendants' summary judgment motion is granted in part and denied in part (d/e 37).

    A) Summary judgment is GRANTED to Defendants on Plaintiff's claim that he was denied of access to the courts and his claim that access to the law library and legal materials as a Level E/P.C. inmate violated his equal protection rights;

    B) Summary judgment is GRANTED to Defendants on Plaintiff's claim that Defendants were deliberately indifferent to the absence of barber services for Plaintiff and his claim that access to barber services as a Level E/P.C. inmate violated Plaintiff's equal

---

[3]This is hearsay in any event. Plaintiff assertions, which arose in response to Defendants' summary judgment motion, are not supported by admissible evidence. He does not present any evidence from the barber about his alleged refusal to cut Plaintiff's hair, his lack of properly sterilized equipment, or his alleged HIV status.

        protection rights;

    C)    Summary judgment is GRANTED to Defendants on Plaintiff's claim that Defendants violated his right to practice his religion under the First Amendment or RLUIPA, and his claim that opportunities for him to practice his religion as a Level E/ P.C. inmate violated his equal protection rights;

    D)    Summary judgment is GRANTED to Defendants on Plaintiff's claims under the Eighth Amendment for present and future injuries resulting from denial of his requests for a non-smoking cell/cellmate.

    E)    Summary judgment is DENIED to Defendants on Plaintiff's claim for injunctive relief regarding the handling of his requests for a non-smoking cell or cellmate upon his return to Menard as a Level E/Protective Custody inmate.

2) This case proceeds solely on a limited claim for injunctive relief regarding Plaintiff's future requests for a non-smoking cell/inmate at Menard. The injunctive relief at issue is limited to whether Plaintiff's request, as a Level E/P.C. inmate, for a non-smoking cell/cellmate will be handled under the same procedures and policies at Menard as requests from inmates in the general population. At this point the claim for injunctive relief proceeds under Eighth Amendment and Fourteenth Amendment. The only remaining defendant is the Warden of Menard Correctional Center in his official capacity. All other defendants are dismissed.

3) Don Hulick, current Warden of Menard Correctional Center according to the IDOC website, is substituted in his official capacity for Wardens McAdory and Hinsley. Fed. R. Civ. P. 25(d)(1). The clerk is directed to add Mr. Hulick in his official capacity to the docket caption.

4) Defendants have until April 30, 2007, to file dispositive or other appropriate motions regarding the remaining claim for injunctive relief.

5) Plaintiff's motion for summary judgment is denied (d/e 43). Disputed questions of fact and law remain on his sole remaining claim for injunctive relief.

Entered this   6th   Day of         March        , 2007.

                                                    **s\Harold A. Baker**

                                                      HAROLD A. BAKER
                                      UNITED STATES DISTRICT JUDGE